Galex Wolf, LLC
1520 U.S. Hwy 130 – Suite 101
North Brunswick, NJ 08902

(732) 257-0550; Fax: (732) 257-5654

Squitieri & Fearon, LLP
32 East 57th Street, 12th Floor
New York, New York 10022
212 421 6491; Fax 212 421 6553
*and* 2600 Kennedy Boulevard, Suite 1K
Jersey City, NJ 07306

Co-Lead counsel for Plaintiffs and the putative class

## UNITED STATES DISTRICT COURT
### For the District of New Jersey, Trenton Vicinage

| | |
|---|---|
| MICHAEL KATZ and CLIFFORD DAVIDSON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>LIVE NATION, INC. d/b/a PNC BANK ARTS CENTER, LIVE NATION WORLDWIDE, INC., GSAC PARTNERS, and ABC COMPANIES 1-5, Defendants. | Civil Action<br><br>09-cv-03740-MLC-DEA |

## PLAINTIFFS' AMENDED BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

## STATEMENT OF FACTS AS ALLEGED IN THE CLASS ACTION COMPLAINT

### Allegation of Facts Regarding the Parties

As alleged in the Class Action Complaint and Jury Demand, Defendants operate the PNC Bank Arts Center amphitheater entertainment facility in Holmdel, New Jersey (hereinafter the "Arts Center").  Compl. ¶¶14, 15.  Since assuming operation of the Arts Center in 1997, Defendants have charged customers a mandatory parking fee in addition to the listed price of admission to Arts Center events on a per-ticket basis, and have listed the mandatory parking fee on each ticket as either a "parking fee" or "facility fee".  Compl. ¶¶ 15-17. and Exhs. A, B. Defendants' standard per-ticket parking fee has typically been $6 per ticket regardless of seat location or admission price.  Compl. ¶18.  Defendants have charged the per-ticket parking fee to all or substantially all attendees at Arts Center performances regardless of whether they parked vehicles at the Arts Center, carpooled to Arts Center events with other ticket holders (who were also each charged a parking fee), traveled to Arts Center events by public transportation, were dropped off at and picked up from Arts Center events, or were unable to drive (or park) a vehicle because of age, lack of license, disability, or other reason.  Compl. ¶¶20-24.   In addition, Defendants have actually charged and collected a greater number of per-ticket "parking fees" than the number of parking spots available for a given Arts Center event because Defendants have maintained substantially fewer parking spaces at the Arts Center than the venue's 17,500 person capacity for events.  Compl. ¶26.  Defendants' mandatory, per-ticket parking fees have therefore not been a fee charged in exchange for parking services, but instead have been a contrivance for Defendants to arbitrarily inflate ticket prices to Arts Center events beyond the advertised and listed admission prices.  Compl. ¶27 and Exh. C (a March 17, 2009 article published by the New York Daily News reporting Defendants' temporary suspension of the $6

parking fee—subsequently reinstated—accompanied by a corresponding increase in admission prices).

In addition, since assuming operation of the Arts Center, Defendants have charged consumers a mandatory "ticket fee" ranging from approximately $6 to $12 per ticket in addition to the advertised and listed price of admission to Arts Center events.    Compl. ¶¶28-29. Defendants have also charged consumers a mandatory "charity fee" ranging from $0.25 to $1.25 per ticket in addition to the advertised and listed price of admission to Arts Center events, but without indicating which charitable organizations were to receive the fees.  *Id.* ¶32-33, Exh. A. Sometimes, Defendants have combined the "charity fee" and the "ticket fee," representing both as a "ticket fee."  *Id.* ¶34.  The mandatory "ticket fees" are not in exchange for any valuable services or other consideration apart from the license to attend the event presumably reflected in the separately-listed admission price, and the "charity fees" are not actually for the benefit of charitable organizations; instead, both have been a contrivance for Defendants to arbitrarily inflate ticket prices.  *Id.* ¶¶31, 36.

In early 2009, Defendants began a promotional program in which they advertised on the Live Nation website that no fees would be charged for tickets purchased from the Live Nation site on certain designated "No Service-Fee Wednesdays."  Compl. ¶37, Exh. D.  Defendants advertised and offered tickets to Arts Center events through the "No Service Fee Wednesday" promotional program on June 3, 2009, June 10, 2009 and June 17, 2009.  *Id.* ¶ 38.  Despite the name of the promotional program, Defendants have continued to charge a mandatory $6 per-ticket "parking fee" to consumers who have purchased tickets to Arts Center events through the "No Service Fee Wednesday" promotional program.  *Id.* ¶39, Exh. E.  Furthermore, although "No Service Fee Wednesday" tickets do not list a "ticket fee" or "charity fee", Defendants have

not actually discounted the fees but have hidden them by charging a greater base admission price for tickets to Arts Center events sold on "No Service Fee Wednesdays" than for tickets sold on previous, regular "service fee" days. *Id.* ¶¶40-41, Exh. E.

On June 6, 2009, Plaintiff Michael Katz (hereinafter, "Plaintiff Katz"), a New Jersey resident, purchased nine tickets from Defendants' internet website to a concert performance by a band called "Blink 182" scheduled to take place at the Art Center on August 26, 2009, and on June 10, 2009, Plaintiff Katz purchased seven additional tickets to the same concert. *Id.* ¶42, Exhs. F, G. All 16 tickets that Plaintiff Katz purchased were general admission tickets for the same seating section of the Art Center (i.e., the "Lawn" section), and were purchased for use by Plaintiff Katz and a group of his friends and family members who planned to attend the Blink 182 concert together. Compl. ¶¶43, 44. The group planned to travel to the concert in several cars, with several members of the group in each car. *Id.* ¶45. Plaintiff Clifford Davidson (hereinafter, "Plaintiff Davidson"), a New Jersey resident, also purchased Arts Center event tickets from Defendants. Db. 3.

All tickets purchased by the Plaintiffs listed a $6.00 "parking fee" on the ticket, which was added to the admission price of each ticket. Compl. ¶46. Also added to the admission price for all tickets was a "charity fee" of at least .25 cents, although the supposed beneficiary of the fee was not listed on the tickets. *Id.* ¶¶33-35, 48. Each of the nine tickets that Plaintiff Katz purchased on June 6, 2009 also listed a $6.25 "ticket fee" (which included the 25-cent charity fee) added to the price of each ticket. *Id.* ¶¶47, 48. Plaintiff Katz was not informed on the face of the tickets or elsewhere what specific services or other consideration he was to receive in exchange for paying the $6.25 "ticket fee." *Id.* ¶49. The seven tickets that Plaintiff Katz purchased on June 10, 2009 did not list a "ticket fee" because Plaintiff purchased them on a day

3

that Defendants designated as a promotional "No Service Fee Wednesday." *Id.* ¶50.  However the seven "No Service Fee Wednesday" tickets still listed a $6 per-ticket "parking fee", and listed a base admission price that was $21.25 higher than that listed for the same tickets purchased four days earlier on a regular "service fee" day. *Id.* ¶¶51, 52.

## ARGUMENT

## I. STANDARD FOR MOTION TO DISMISS.

On a Rule 12(b)(6) motion to dismiss for failure to state a claim for which relief may be granted, the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir.2008).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). See also *Ashcroft v. Iqbal*, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).  "In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of America*, 361 F.3d 217, 222 n. 3 (3d Cir.2004) (citation omitted).

Further, although the Plaintiffs claims are brought under a statute entitled the New Jersey Consumer Fraud Act ("NJCFA"), their claims do not sound in actual fraud, but instead are brought under a provision of the NJCFA that imposes liability for "unconscionable commercial practices" and therefore, the heightened pleading standard required for common law fraud claims set forth at Fed.R.Civ.P. 9(b) is not applicable.    This issue was recently examined comprehensively in a published opinion by the Bankruptcy Court for the District of New Jersey that includes a useful survey of the relevant case law on this issue.  *In re Norvergence, Inc.* --- B.R. ----, 2010 WL 688053 (Bkrtcy.D.N.J.,2010).   The court ruled that Rule 9(b) applies only to NJCFA claims that "sound in fraud", relying on an opinion of the 7th Circuit Court of Appeals considering the applicability of Rule 9(b) to a claim of "unfair conduct" under Illinois's similar "Consumer Fraud Act", *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.*, 536 F.3d 663, 669-70 (7th Cir.2008).   Quoting from *Windy City*, the Bankruptcy Court wrote,

> [b]ecause neither fraud nor mistake is an element of unfair conduct under Illinois Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b). Therefore, under federal notice pleading standards, the complaint need only provide a short and plain statement of the claim that shows, through its allegations, that recovery is plausible rather than merely speculative. [*Windy City*] at 670.

> This Court finds the rationale espoused by the Seventh Circuit persuasive. In many respects, the construction of the Illinois Consumer Fraud Act appears similar to the approach exhibited by New Jersey courts with respect to the NJCFA. The Appeals Court's decision supports Plaintiff's position and compels this Court to agree that Rule 8(a), not Rule 9(b) is to be applied to Plaintiff's claim for unconscionable conduct against Defendant as embodied by Count V of the Second Amended Complaint.

*In re Norvergence, Inc.* --- B.R. ----, 2010 WL 688053 at *25.    Similarly, and as discussed at length in following sections of this brief, *infra*, the Plaintiffs NJCFA claims allege primarily that

5

Live Nation engaged in "unconscionable commercial practices" (not "fraud") by exploiting its superior bargaining position and unique nature of its services (exclusive concert performances by particular artists) to coerce Plaintiffs and other New Jersey consumers to pay - in addition to the listed price of admission - unfair and arbitrary junk fees. Because their claims do not "sound in fraud" Plaintiffs should not be held to the pleading requirements of Rule 9(b)[1].

## II. THE NJCFA EXPRESSLY AUTHORIZES A "STAND-ALONE CLAIM FOR UNCONSCIONABLE PRACTICES", CONTRARY TO THE FUNDAMENTAL PREMISE OF DEFENDANTS' ARGUMENT FOR DISMISSAL.

Defendants' motion to dismiss relies almost entirely on the false premise that "New Jersey courts do not recognize a stand-alone claim for unconscionable practices under the NJCFA. Rather, unconscionable practices must contain some form of deception or misrepresentation to make them actionable under the NJCFA."

Db. 17. Thus, according to Defendants, even if Live Nation's fee policies at the Arts Center (requiring every fan who attends a performance there to pay not just the listed price of admission, but also a mandatory "parking fee" regardless of whether or to what degree the fan requires parking, a "charity fee" with no beneficiary, and a "ticket fee" a/k/a "service fee" in exchange for no apparent services or other consideration) were found by a jury to be "unconscionable practices", there would be nonetheless be no NJCFA violation unless the practices somehow "misled" customers to purchase tickets for concerts held at the Arts Center.

In reality, the NJCFA unquestionably *does* provide for a "stand-alone claim for unconscionable practices", as the New Jersey Supreme Court explained in *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464 (N.J.,1988)

---

[1] Even if Rule 9(b)'s requirements were applied to Plaintiffs' claims, the Amended Complaint provides a detailed factual account of the bases for Plaintiffs' claims, and is more than sufficient to satisfy Rule 9(b)'s particularity requirements.

> **To prove a violation of section 56:8-2, it is not necessary to show actual deceit or a fraudulent act; any unconscionable commercial practice is prohibited.** The phrase "unconscionable commercial practice" is not defined in the Act... [W]e have defined the term as "[t]he standard of conduct contemplat[ing] * * * good faith, honesty in fact and observance of fair dealing." *Kugler v. Romain*, 58 N.J. 522, 544 (1971). We anticipated that courts would "pour content" into the concept on a case-by-case basis. Id. at 543.

*Meshinsky, supra*, 110 N.J. at 472 (emphasis added, some internal citations omitted).    This "stand-alone claim of unconscionable practices under the NJCFA" is not some judicial construct (dependent, as Defendants suggest, upon the New Jersey courts' "recognition"), but was deliberately created by the New Jersey legislature in a 1971 amendment to the NJCFA that created a private right of action and also "broadened the definition of 'unlawful practices' in N.J.S.A. 56:8-2 to include 'any unconscionable commercial practice.'" *D'Ercole Sales, Inc. v. Fruehauf Corp.*, 206 N.J.Super. 11, 23 (App.Div.1985, internal citations omitted).  Thus, N.J.S.A. 56:8-2 now reads, in relevant part as follows:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, *or* the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale * * * *or* with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

(emphasis added).    In construing this provision, the courts have pointed to the use of the disjunctive "or" in the list of prohibited contacted as conclusive proof of legislative intent for each type of conduct on the list - including "unconscionable commercial practices" - to be treated as a separate (or to use Defendant's "stand-alone") "unlawful practice."

> The statutory elements of N.J.S.A. 56:8-2 are in the disjunctive rather than the conjunctive. As such, a violation may occur if there is a showing of "unconscionable commercial practice." There need be no showing of a deceptive or fraudulent act.

*D'Ercole Sales, Inc. v. Fruehauf Corp.*, 206 N.J.Super. 11, 23, 501 A.2d 990, (App.Div.1985, internal citations omitted).  See also *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 20 (1994).

Thus, the New Jersey courts have consistently recognized and enforced an independent, "stand-alone" prohibition against "unconscionable commercial practices" created by the NJCFA, without any allegation or showing of actual fraud, misrepresentation or deception by the seller and or of inducement or reliance by the consumer. *Meshinsky v. Nichols Yacht Sales, supra*, 110 N.J. at 472; *Cox v. Sears, supra*, 138 N.J. at 20; *Skeer v. EMK Motors, Inc.*, 187 N.J.Super. 465, 470 (App. Div.1982)("Violation of the act can be shown even though a consumer has not in fact been misled or deceived. N.J.S.A. 56:8-2.  It is not necessary to show actual deceit or a fraudulent act; any unconscionable commercial practice is prohibited."); *Truex v. Ocean Dodge, Inc.*, 219 N.J.Super. 44, 49 (App. Div. 1987); *D'Ercole Sales, Inc. v. Fruehauf Corp., supra* 206 N.J.Super. at 22; *State v. Hudson Furniture Co.*, 165 N.J.Super. 516, 520 (App.Div.1979); *Miller v. American Family Publishers*, 284 N.J.Super. 67, 75 (Ch. Div. 1995).  The federal courts have also treated "unconscionable commercial practices" as an independent basis for liability under the NJCFA with no requirement that the merchant's conduct was misleading or that the consumer was in fact misled:

> Defendants argue that the...Complaint is devoid of any allegation of a specific representation or affirmative statement... that could serve as the basis for an action for fraud." **The CFA does not, however, require an affirmative statement or representation. <u>A CFA claim may proceed based on allegations of an "unconscionable commercial practice.</u>"** As the New Jersey Supreme Court has noted, "unconscionability is 'an amorphous concept obviously designed to establish a broad business ethic ....' "

*Dewey v. Volkswagen AG*, 558 F.Supp.2d 505, 525 (D.N.J. 2008), quoting *Cox v. Sears, supra* 138 N.J. at 18. See also *Suber v. Chrysler Corp.*, 104 F.3d 578, 586 (3d Cir. 1997)("The NJCFA allows private plaintiffs to bring suit if they are harmed by an unconscionable commercial

practice."; *Professional Cleaning and Innovative Bldg. Services, Inc. v. Kennedy Funding, Inc.*
245 Fed.Appx. 161, 165 (3d Cir. 2007)("The conduct specified in the NJCFA as amounting to an
unlawful practice is disjunctive. Therefore, "[p]roof of any one of those acts or omissions or of a
violation of a regulation will be sufficient to establish unlawful conduct under the Act."); *In re
National Credit Management Group*, L.L.C. 21 F.Supp.2d 424, 449-450 (D.N.J., 1998) ("acts
defined as unlawful in [N.J.S.A. 56:8-2] are set out in the disjunctive. They include: (1)
unconscionable commercial practices [and others]. Establishing that the conduct of a defendant
constitutes an unlawful act will set forth a violation of the CFA, regardless of any proof of
intent."); *In re Cohen*, 191 B.R. 599, 608 (D.N.J.1996), aff'd, 106 F.3d 52 (3d Cir.1997), aff'd,
523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998)("this Court also affirms the bankruptcy
court's conclusion that the debtor committed an "unconscionable commercial practice," another
of the "affirmative acts" of the Consumer Fraud Act which do not require "intent."); *In re
NorVergence, Inc.* 384 B.R. 315, 356-357 (Bkrtcy.D.N.J. 2008)("...a defendant may be liable
under the NJCFA as a result of engaging in an "unconscionable commercial practice," without
also engaging in an act of fraud).

Also contrary to the statutory language and precedent is Defendants' assertion (at Db8)
that Live Nations' allegedly unconscionable practices cannot amount to NJCFA violations unless
they misled or induced the Plaintiffs into paying to attend performances at the Arts Center. As
aptly explained by the Court in *In re National Credit Management Group*, L.L.C. 21 F.Supp.2d
424, 449-450 (D.N.J., 1998),

> Although initially enacted to combat "sharp practices and dealings" that
> victimized consumers by attracting them into purchases through fraudulent or
> deceptive means, *see Cox*, 138 N.J. at 16, 647 A.2d 454 (citing D'Ercole Sales,
> Inc. v. Fruehauf Corp., 206 N.J.Super. 11, 23, 501 A.2d 990, (App.Div.1985)),
> **the CFA no longer focuses solely on "shifty, fast-talking and deceptive
> merchant[s]" but reaches "nonsoliciting artisans" as well.** *Id.* (quotation

omitted). **This expansion of the CFA [by amendment in 1971] increased the breadth of the definition of an "unlawful practice" to include an "unconscionable practice."** *See Miller*, [*supra*] 284 N.J.Super. at 74, 663 A.2d 643.

*In re National Credit Management Group*, L.L.C. 21 F.Supp.2d 424, 449-450 (D.N.J., 1998). In fact, the New Jersey courts have specifically held the NJCFA can be violated by unconscionable commercial conduct having nothing to do with inducement of the sale, but only with the "subsequent performance." *Jefferson Loan Co. v. Session*, 397 N.J.Super. 520 (App.Div.2008).

In support of their assertion that *all* NJCFA violations must be "misleading" Defendants quote from *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 N.J. 392, 416 (1995):

> To constitute consumer fraud... the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average customer...

Db7. Unfortunately, this quote is itself misleading and omits material language from the quoted passage that, if left in, reveals that ***Turf Lawnmower* was not even a CFA case.** Rather, *Turf Lawnmower* was a libel case in which the Court considered whether a newspaper that published an allegedly false accusation of "consumer fraud" had acted with "actual malice" necessary to overcome the newspaper's qualified immunity against libel. *Turf Lawnmower, supra*, 139 N.J. at 416. In the language quoted in Defendants' brief, the Court was formulating a standard for what types of "consumer fraud" would trigger "actual malice" when falsely reported and which would not. The unedited version of the quote reads as follows (with the omitted parts emphasized):

> To constitute consumer fraud ***sufficient to trigger the actual-malice standard***, the business practice in question must be "misleading" and stand outside the norm of reasonable business practice in that it will victimize the average consumer***, and thus most clearly and directly involve a matter of legitimate public concern.***

*Id.* Because none of the parties in this case are a newspaper accused of libel for falsely reporting that the other party committed "consumer fraud", *Turf Lawnmower* is completely inapposite.

### III.  THE FACTS ALLEGED IN THE COMPLAINT EASILY STATE A CLAIM OF "UNCONSCIONABLE COMMERCIAL PREACTICES" IN VIOLATION OF THE NJCFA AS CONSTRUED BY THE NEW JERSEY COURTS.

The New Jersey Supreme Court has spoken directly as to what a plaintiff must allege and prove in order to establish an "unconscionable commercial practice" in violation of the NJCFA,

The phrase "unconscionable commercial practice" is not defined in the Act... **[W]e have defined the term as "[t]he standard of conduct contemplat[ing] * * * good faith, honesty in fact and observance of fair dealing."**

*Meshinsky v. Nichols Yacht Sales, Inc.*, *supra*, 110 N.J. at 472, quoting *Kugler v. Romain*, 58 N.J. 522, 544 (1971)(emphasis added).  The Court acknowledged that unconscionable conduct is an **"amorphous concept** obviously designed to establish a broad business ethic", and therefore was to be determined **"on a 'case-by-case basis.'"** *Meshinsky*, *supra* at 472, quoting *Kugler*, *supra* at 543.  See also *Cox v. Sears, supra*, 138 N.J. at 18 (1994); *Gonzalez v. Wilshire Credit Corp.*, -- N.J. Super --, 2010 WL 334962, *6+ (App.Div. 2010); *Jefferson Loan Co. v. Session*, 397 N.J.Super. 520, 534-535 (App.Div. 2008); *Associates Home Equity Services v. Troup*, 343 N.J.Super. 254, 278 778 A.2d 529 (App.Div.2001); *Dewey v. Volkswagen AG*, 558 F.Supp.2d 505, 525 (D.N.J. 2008).   Where, as here, a jury trial has been demanded, **"plaintiffs' claim that the [business] had engaged in an unconscionable commercial practice in violation of N.J.S.A. 56:8-2 [is] for a jury to decide."**  *Gonzalez v. Wilshire Credit Corp.*, *supra*, -- N.J. Super --, 2010 WL 334962, *6+ (App.Div. 2010); *Associates v. Troup*, *supra*, 343 N.J.Super. at 278.

When a court or jury conducts the "case-by-case" analysis required to decide a claim of unconscionable commercial practices under N.J.S.A. 56:8-2, **"[t]he word "unconscionable" _must_ be interpreted liberally so as to effectuate the public purpose of the CFA."**  *Associates v. Troup*, *supra*, 343 N.J.Super. at 278, quoting *Kugler v. Romain*, *supra*, 58 N.J. at 543

(emphasis added).  See also *Gonzalez v. Wilshire Credit Corp.*, *supra*,-- N.J. Super --, 2010 WL 334962, *6+; *Jefferson Loan Co. v. Session*, *supra*, 397 N.J.Super. at 535;  *Busse v. Homebank LLC*, 2009 WL 424278  *7 (D.N.J. 2009)("The Supreme Court of New Jersey has interpreted the word 'unconscionable' liberally  to effectuate the [NJCFA]'s public purpose." citing *Kugler v. Romain*, *supra*, 58 N.J. at 543). The courts' duty to construe the NCFA expansively was discussed at length by the New Jersey Appellate Division in *Jefferson Loan v. Sessions*, while ruling that "unconscionable commercial practices" are not limited to deceptive practices aimed at inducing sales, but also encompass abusive or overreaching practices *in connection with* sales (specifically, the defendant's allegedly abusive *post-sale* automobile repossession and collection conduct):

> The CFA is "one of the strongest consumer protection statutes in the nation." *Cox v. Sears [supra]* 138 N.J. at 15 []. "Courts have repeatedly stressed that similar to other remedial legislation, the [CFA] should be construed liberally in favor of consumers." *Ibid.* Moreover, "[t]he history of the [CFA] is one of constant expansion of consumer protection." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 604 [] (1997). Accordingly, **we "deem it our responsibility to construe the [CFA] broadly, not in a crabbed fashion."** *New Mea Constr. Corp. v. Harper*, 203 N.J.Super.  486, 502 [] (App.Div.1985). **Because of the unforeseeable varieties of abuses that are continually devised to take advantage of consumers, trial courts are instructed to interpret the CFA broadly in determining the range of endeavors that fall under its protective umbrella.**

*Jefferson Loan Co. v. Session*, *supra*, 397 N.J.Super. at 535, citing *Lemelledo v. Beneficial Mgmt.*, 150 N.J. 255, 265 (1997).   Finally, the courts have stressed the significance of the relative bargaining power of the parties and the consumer's ability to meaningfully negotiate the terms of the sale in determining whether challenged conduct amounts to unconscionable commercial practices subject to N.J.S.A. 56:8-2:

> The word "unconscionable" must be interpreted liberally so as to effectuate the public purpose of the CFA.  It is not intended to "erase the doctrine of freedom of contract, but **[it is intended] to *make realistic* the assumption of the law that the agreement has resulted from real bargaining between parties who had freedom of choice and**

> **understanding and ability to negotiate in a meaningful fashion."** The standard of conduct contemplated by the unconscionability clause is "good faith, honesty in fact and observance of fair dealing"... Whether a particular practice is unconscionable must be determined on a case-by-case basis.

*Associates v. Troup, supra,* 343 N.J.Super. at 278, quoting *Kugler v. Romain, supra,* 58 N.J. at 543 (emphases added). See also *Gonzalez v. Wilshire Credit Corp., supra,*-- N.J. Super --, 2010 WL 334962, *6+; *Busse v. Homebank LLC,* 2009 WL 424278 *7 (D.N.J. 2009).

Applying these extraordinarily liberal standards to the present case, it is beyond question that the Plaintiffs' Class Action Complaint and Jury Demand contains *factual* allegations (and not mere legal conclusions or "formulaic recitations" of law) that, if proven, would easily permit a jury to find Live Nation's fee policies at the Arts Center to be unconscionable commercial practices in violation of the NJCFA.

### A. Plaintiffs Have Alleged Facts Sufficient to Support their Claims of Unconscionable Commercial Practices Relating to Arts Center "Parking Fees".

The Complaint alleges that Live Nation has charged the Plaintiffs and every other music fan who wished to see a particular band or artist perform at the Arts Center a mandatory fee of $6 each for "parking" even if they only wished to purchase admission to the performance and did not want or need to purchase parking. Compl. ¶¶16-24. Live Nation has stated that it set the $6 per-ticket "parking" fee with the assumption that fans would typically arrive at Arts Center performances in one car occupied by two ticketholders. (Compl. Exhibit A). Thus, even fans that *did* intend to park at the Arts Center were forced to pay for what amounted to one-half of a parking space, regardless of how many parking spaces they actually needed.

With respect to Plaintiff Michael Katz, when he purchased admission to the Blink 182 concert for himself and 15 friends and family members, Live Nation also required him to pay 16 separate $6 "parking fees", and thus purchase eight parking spots (according to Live Nation's

purported two-fan-per-car "study"), even though he and his friends and family intended to drive no more than five cars to the Blink 182 concert (the Complaint at ¶¶44,45 alleges that they planned to travel with "several" - i.e., at least three - of the 16 group members per car, which means they would arrive, at most, in five cars). Again, the Complaint alleges that the fee for parking was mandatory (Compl. ¶¶16-18), and therefore *if Mr. Katz declined to purchase and pay in advance for the unwanted and unneeded extra 3 parking spots, Live Nation would simply refuse to allow him or his friends and family members to see Blink 182 perform at the Arts Center.*

This is one of several essential differences between Live Nation's coercive fee policies at the Arts Center and the simple "excessive price" cases that Defendants rely upon in their brief, such as *Quigley v. Esquire Deposition Service, LLC*, 409 N.J. Super 69 (App.Div. 2009). The plaintiff in *Quigley* -- a disgruntled litigant claiming to have been overbilled for deposition transcripts -- had received the services at issue (the transcripts) and was left with considerable bargaining power and opportunity to meaningfully negotiate the price he eventually paid (which was less than one-third of the amount defendant billed). This led the Court to conclude that the defendants' allegedly high billing rate did not amount to unconscionable commercial practices subject to the NJCFA:

> Plaintiff has not alleged that defendant engaged in... deceptive *or* unfair sales practices. Plaintiff simply ordered the transcripts of his deposition without any prior discussion of the price. When plaintiff received the invoices for the transcripts, it was within his power to refuse payment of the full amount on the ground that the charge exceeded what was "reasonable" and thus violated *Federal Rule* 30(f)(3). In fact, plaintiff followed this course and tendered defendant less than one-third of its charge, which defendant apparently accepted. Therefore, the trial court properly dismissed [plaintiff's claim of unconscionable commercial practices]

*Quigley, supra*, 409 N.J. Super at 80-81 (emphasis added to note the Court's recognition that allegations of unfair practices **_or_** deceptive practices were required to state a NJCFA claim**).**

By contrast the Plaintiffs here had virtually no bargaining power or meaningful ability to negotiate the terms of their transactions with Live Nation, which were set by Live Nation on a take-it-or-leave-it basis. Plaintiffs either paid for the unneeded parking services and other allegedly unfair and/or bogus "fees" in addition to paying the listed price of admission for a particular artists' performance at the Art Center, or they did not get to see the particular artist perform in concert.   Further, unlike an ordinary service provider, such as the court reporting service in *Quigley*, the "service" that Live Nation provides in a given sale - presentation of a live concert performance by *a particular artist* of *specific interest to the buyer* - are not subject to comparison shopping.  Plaintiff Katz could not have simply gone to another concert promoter for a Blink 182 concert last August, in hopes of finding one that did not require the purchase of unneeded parking spaces and payment of bogus charity and ticket/service fees along with the admission price.   Circumstances like these -- where a seller allegedly abuses its far greater bargaining power and the lack of alternative sources of the particular service offered -- are not the "ordinary" circumstances referred to by the Court in *Quigley* in the language quoted in Defendants' brief (at Db. 13), "We live in a capitalist society in which prices are ***ordinarily*** established by the marketplace [and]...[s]ellers of goods and services ***generally*** may charge whatever the market will bear.." *Quigley, supra,* at 80.    Rather, these are *precisely* the circumstances contemplated by the NJCFA's proscription against unconscionable commercial practices, the purpose of which "is not intended to 'erase the  doctrine of freedom of contract'" generally, but *is* intended to

**to *make realistic* the *assumption of... law* that the agreement has resulted from real bargaining between parties who had freedom of choice and**

> **understanding and ability to negotiate in a meaningful fashion."** The standard
> of conduct contemplated by the unconscionability clause is "good faith, honesty
> in fact and observance of fair dealing"... Whether a particular practice is
> unconscionable must be determined on a case-by-case basis.

*Associates v. Troup, supra,* 343 N.J.Super. at 278, quoting *Kugler v. Romain, supra,* 58 N.J. at

543 (emphases added).

Live Nation's coercive "parking" and other fees are essentially similar to the "loan

packing" practices that the New Jersey courts have held to be within the scope of

"unconscionable commercial practices" proscribed by N.J.S.A. 56:8-2. *Lemelledo v. Beneficial*

*Mgmt.,* 150 N.J. 255 (1997); *Gonzalez v. Wilshire Credit Corp., supra,* -- N.J. Super --, 2010 WL

334962, *6+ (App.Div. 2010). In *Lemelledo* the Court explained that

> "Loan packing" refers to a practice on the part of commercial lenders that
> involves increasing the principal amount of a loan by **combining the loan with**
> **loan-related services, such as credit insurance,** *that the borrower does not*
> *want.*

*Lemelledo, supra,* 150 N.J. at 259-260. The plaintiff in *Lemelledo* was a woman who applied

for a loan from the defendant to help pay for her daughter's college tuition and was approved.

*Id.,* at 260. When the plaintiff went to the defendant's office to sign the loan documents and

pick up the loan check, the

> defendant presented her with numerous forms, including a loan contract for
> $2,538.47 and a check payable to her for $2,203.19... The difference between the
> amount in the loan contract and the amount of the loan check ($335.28) was listed
> as "Amount Paid to Others on Your Behalf" and consisted of credit-insurance
> premiums, to be paid initially by defendant and added to the loan principal to be
> repaid by plaintiff. The premiums-credit property insurance ($170.10), credit
> disability insurance ($123.98), and credit life insurance ($41.20)-covered the
> possibility that plaintiff would default on her loan repayments. The loan,
> including the insurance premiums, was provided at an interest rate of twenty-eight
> percent; plaintiff was to make thirty-six monthly payments of $105.00 each.
>
> Defendant apparently offers such insurance policies to all borrowers in order to
> provide greater assurance that the loans will be repaid. It sells the policies through
> either one of its insurance subsidiaries or an unaffiliated insurance company and

receives a forty-percent commission from each sale. Defendant also receives substantial interest income from the sales because the amount of the insurance premium is incorporated into the loan principal and accrues interest, in this case at a rate of twenty-eight percent. When defendant sells the policies to borrowers, it provides them with a form entitled "Disclosure of Credit Costs," which states that the insurance is not a prerequisite to obtaining credit and that, if the borrower chooses to purchase the insurance, she can do so from any insurer. Those disclosures are required by law. N.J.S.A. 17:10-14.1a (replaced by N.J.S.A. 17:11C-21d).

*Lemelledo, supra,* 150 N.J. at 261.  The plaintiff admitted that she received disclosures that the insurance premium was being added to the principal balance of her loan, and that "defendant informed her, through the "Disclosure of Credit Costs" statement, that she did not have to purchase the insurance premiums..." *Id.*  Despite having received these disclosures, the plaintiff signed the loan contract obligating her to repay the premium for the unwanted credit insurance, claiming she feared that "if she did not purchase the insurance, she would not receive the loan." *Id.*  The New Jersey Supreme Court granted certification for appeal on the plaintiff's claims under the CFA  and superficially to "evaluate whether loan packing violates its provisions." *Lemelledo, supra,* 150 N.J. at 264, and ruled in the plaintiff's favor, focusing on "the broad legislative intent evident from the language and policy goals of the CFA." *Id.*

The "parking" and other fees that Live Nation charges in addition to the listed admission price for Arts Center events are similar to, and perhaps even more coercive and unfair than the "loan packing" practices described in *Lemelledo.*  Both cases involve a consumer approaching a merchant for the purchase of a particular service (in *Lemelledo,* a loan, in the present case, admission to a particular Arts Center concert) and the merchant conditioning the sale of the *desired* service on the consumer's payment for additional unrequested and unwanted services (in *Lemelledo,* credit insurance, in the present case, parking, a purported donation to "charity", and whatever "service" is supposed  to be provided in exchange for the "ticket" or "service" fee).

Unlike in *Lemelledo*, however, where the plaintiff received an actual credit insurance policy in exchange for the add-on charge, it is unclear what, if anything, consumers received in exchange for Live Nation inscrutably labeled fees paid in addition to the listed price of admission.

**B. Plaintiffs Have Alleged Facts Sufficient to Support their Claims of Unconscionable Commercial Practices Relating to Live Nation's "Charity Fee" and "Ticket Fees".**

The Complaint contains allegations of fact that support the claim that Live Nation has collected a 25 cent "charity" fee from every consumer who has attended an Arts Center event, but has not forwarded the money collected to a charitable organization.  Compl. ¶¶32-36.   If these allegations are proven, there is question that this conduct would constitute and unconscionable commercial practice in violation of N.J.S.A. 56:8-2.   As far as evidential "heft" the Complaint includes a news report of a party admission that Live Nation itself did not know what charity it had been charging and collecting this money for since assuming operations at the Arts Center.   Compl., ¶35, Exhibit A.[2]

The Complaint also contains allegations of fact that support the claim that Live Nation's "ticket fees", which also sometimes referred to as "service fees" are nothing more than profit padding fees, that the Plaintiffs and other Arts Center patrons have received absolutely no additional consideration in exchange for these fees, and that the fees are elastic and vary substantially with no apparent rational basis from event to event.   Compl. ¶29.   As discussed in

---

[2]  After the Complaint was filed, Live Nation made a public statement claiming that it was "required" under its lease for the Arts Center to collect the 25 cent fee on each ticket, and that, also pursuant to the lease, the money was given "directly" the Garden State Arts Foundation. Upon obtaining a copy of Live Nation's lease, Plaintiffs have learned that the lease neither "requires" nor contemplates a 25 cent surcharge to every ticket holder, although there are provisions about specially designated fundraising events for the Gardens State Arts Center Foundation. Live Nation's public misstatements regarding the charity fee lends additional "heft" to the claims relating to charity fees, and they will be described in an amended complaint if the Court orders one.

the previous subsection, when charged in the context of a transaction that lacks any "real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion" these fees must be scrutinized to see if Live Nation's practice of charging them meets the standard of "good faith, honesty in fact and observance of fair dealing" that is "contemplated by the [NJCFA's] unconscionability clause." *Associates v. Troup, supra,* 343 N.J.Super. at 278, quoting *Kugler v. Romain, supra,* 58 N.J. at 543.   If the trier of fact finds that the average consumer who *did* have "the ability to negotiate in a meaningful fashion" would not agree to pay such a fee, the unconscionability clause of the NJCFA was enacted to operate so as "to *make realistic* the assumption of the law that the agreement has resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion." *Id.*

### IV. DEFENDANTS APPARENTLY DO NOT CHALLENGE THE SUFFICIENCY OF THE PLAINTIFFS' PLEADINGS WITH RESPECT TO "ASCERTAINABLE LOSS" UNDER THE CFA, AS THIS ISSUE WAS NOT RAISED IN DEFENDANTS' BRIEF.

Defendants' initial brief includes no challenge or argument whatsoever regarding the sufficiency of Plaintiffs' pleadings on the issue of "ascertainable loss" (which is an element of a private NJCFA action under N.J.S.A. 56:8-19).  Defendants are therefore foreclosed from raising such a challenge in their reply brief. *Bayer AG v. Schein Pharmaceutical, Inc.,* 129 F.Supp.2d 705, 716 (D.N.J.2001) (argument raised for first time in reply must be stricken); *Rickenbach v. Wells Fargo Bank, N.A.,* 635 F.Supp.2d 389, 395 fn4 (D.N.J. 2009)(same).

Plaintiffs will assume that Defendants' omission of any discussion of ascertainable loss signals their decision to not challenge the sufficiency of the pleadings on this issue, in light of the obviousness of the alleged loss (i.e., payment of allegedly improper fees) and the relatively liberal pleading requirements for ascertainable loss. See *Maniscalco v. Brother Int'l Corp.*

*(USA)*, 627 F. Supp. 2d 494, 502-503 (D.N.J. 2009) (allegation that plaintiff "suffered an ascertainable loss and actual injury" is sufficient to state CFA claim because, "[a]lthough the loss must be ascertainable, no special specificity with regard to pleading ascertainable loss is required."); *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 110-111 (App. Div. 2006) ("[P]laintiff alleged in her complaint that she suffered an ascertainable loss. She did not allege the nature of that loss, nor was she so required at [the pleading] stage").

In any event, Plaintiffs object in advance to any attempt by Defendants to raise, for the first time in their reply brief, a challenge to the sufficiency of the Complaint with respect to ascertainable loss, and respectfully request in advance that the Court strike and disregard any such newly proffered challenge or, in the alternative, grant Plaintiffs leave to file a sur-reply.

## V. PLAINTIFFS HAVE ALLEGED FACTS SUFFICIENT TO SUPPORT THEIR CLAIMS UNDER THE TRUTH IN CONSUMER CONTRACT, WARRANTY AND NOTICE ACT ("TCCWNA") .

TCCWNA is a consumer protection statute aimed primarily at deterring businesses from using documents (contracts, notices, signs, etc.) in transactions with consumers that violate consumers' rights and business's responsibilities under any other New Jersey or Federal law. Specifically, TCCWNA provides that

> No seller... shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign... which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller... as established by State or Federal law...

N.J.S.A. 56:12-15.   Plaintiffs have alleged that by displaying fees that violate the NJCFA on its webpage, confirmation emails, invoices, and tickets, Live Nation has also violated TCCWNA. Compl. ¶¶88-91.

In support of the motion to dismiss Plaintiffs' TCCWNA claims, Defendants offer only one argument, i.e., the TCCWNA claims fail because the NJCFA claims upon which they are predicated fail.  Db19.   Thus, as a corollary to this argument, if the Court denies Defendants' motion with respect to any of the NJCFA claims, it should also deny the motion with respect to the corresponding TCCWNA claim.

As with the issue of ascertainable loss under the NJCFA, Defendants have failed to make any other substantive arguments with respect to Plaintiffs' claims under the Truth in Consumer Contract, Warranty and Notice Act ("TCCWNA").   As with the ascertainable loss issue, Plaintiffs object in advance to any attempt by Defendants to raise, for the first time in their reply brief, a challenge to the sufficiency of the Complaint with respect to the TCCWNA claims other than the challenges to the underlying NJCFA violations, and respectfully request in advance that the Court strike and disregard any such newly proffered challenge or, in the alternative, grant Plaintiffs leave to file a sur-reply.

## VI.  LIVE NATION, INC. ("LNI") IS SUBJECT TO SPECIFIC JURISDICTION IN NEW JERSEY[3].

"A federal court sitting in New Jersey has jurisdiction over the parties to the extent provided under New Jersey state law." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004) (citing FED. R. CIV. P. 4(e)).   "New Jersey has expressed as its policy its intent to exercise personal jurisdiction over nonresident defendants to the extent 'consistent with due process of law.' *Katz v. Katz*, 310 N.J. Super. 25, 30 (App. Div. 1998) (quoting R. 4:4-4(d)(1)).

---

[3] Based on Defendants' Assertions, as well as the Assumption Agreement attached to the Munistieri Certification submitted in support of Defendants' Motion to Dismiss, that GSAC was dissolved by operation of law as of December 31, 2007, and that the liabilities and obligations of GSAC were assumed by Live Nation Worldwide, Inc. ("LNW"), Plaintiffs will voluntarily withdraw their claims against GSAC following a decision by this Court on Defendants' Motion to Dismiss.

Due process requires only that in order to subject an out of state defendant to personal jurisdiction in New Jersey Courts, "he have certain minimum contacts with it such that the maintenance of the suit does not 'offend traditional motions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).

"There are two ways that sufficient contacts for asserting personal jurisdiction can be established: 'general jurisdiction' and 'specific jurisdiction'" *Schindler Elevator Corp. v. Otis Elevator Co.,* No. 09-cv-0560 (DMC), 2010 WL 1032651, *3 (D. N.J. 2010).  Physical presence within the forum is not required to establish personal jurisdiction over a nonresident defendant. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985).  Once a Defendant has raised a jurisdictional defense, however, the plaintiff must show that the defendant has purposefully directed its activities toward the residents of the forum state, or otherwise purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. *IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998) (citations omitted).  If the Plaintiff has made a prima facie case of personal jurisdiction, it is "entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith,* 384 F. 3d 93, 97 (3d Cir. 2004); *See also Metcalfe v. Renaissance Marine, Inc.,* 566 F.3d 324, 331 (3d Cir. 2009).  Contrary to Defendants' assertions, Plaintiffs here have clearly met their burden in alleging New Jersey's jurisdiction over Defendant LNI.

In order to assert specific jurisdiction over a foreign defendant, a plaintiff must demonstrate that the defendant had minimum contacts with New Jersey, defined as purposeful acts by the defendant directed toward the State, that make it reasonable for the defendant to anticipate being haled into court in New Jersey, and the plaintiff must demonstrate that those

minimum contacts gave rise to the claimed injury.   *Mastrondrea v. Occidental Hotel Management S.A.*, 391 N.J. Super 261, 268-69 (N.J. Super. A.D. 2007).   In order to assert specific jurisdiction over a foreign defendant, if a plaintiff successfully demonstrates the existence of the requisite minimum contacts, then a further determination must be made whether the exercise of personal jurisdiction over the defendant would offend traditional notions of fair play and substantial justice. *Id.* at 269.

While ordinarily, a district court may not exercise jurisdiction over a defendant corporation if the only connection with the state is through that defendant's subsidiaries, *Jemez Agency, Inc. v. CIGNA Corp.,* 866 F.Supp. 1340, 1349 (D.N.M.1994),  a parent company can be haled into an out-of-state court provided that plaintiff makes a prima facie showing that application of the forum state's rules of corporate law would result in piercing the corporate veil or imposing liability through any specific principles.   *Id.* at 1348-49.  Under New Jersey law, a parent corporation will be held liable for the acts of its subsidiary if the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice or otherwise to circumvent the law. *Shotmeyer v. New Jersey Realty Title Ins. Co.*, 195 N.J. 72, 87 (N.J. 2008) (citations omitted).

Here, Plaintiffs allege the requisite intent to perpetrate a fraud, and thereby satisfy New Jersey's standard for exercising specific jurisdiction over Defendant LNI.

Plaintiffs' Complaint alleges that Defendant LNI is the parent company of both LNW and of the "various subsidiaries, predecessors, and/or acquires" that partnered to form GSAC Partners in 1996.  Complaint ¶¶ 8-9.  These subsidiaries, according to the Partnership Agreement for GSAC Partners (Wolfe Decl., Exh. A), included Pavilion Partners and Exit 116 Revisited, Inc. – both fully owned subsidiaries of LNI, and both authorized to do business in New Jersey.

LNI, therefore, caused two companies to form a third, GSAC Partners, only for the purposes of leasing the PNC Bank Arts Center and selling tickets to performances therein, thereby availing itself of the privilege of conducting business in New Jersey.  Through GSAC, LNI engaged in unconscionable and deceptive practices against Plaintiffs and the other members of the Class by charging improper and unlawful fees and enticing consumers with nonexistent promotions.  Complaint ¶¶ 55-91.  By spearheading the creation of a New Jersey Partnership for the purposes of conducting these activities, LNI could have reasonably anticipated being haled into Court in New Jersey as a result of GSAC's fraudulent activities within the state.

Because Plaintiffs' injuries stem from those very activities within New Jersey, LNI is subject to specific jurisdiction in this Court.

## VII.    IF THE COURT GRANTS DEFENDANTS' MOTION, PLAINTIFFS REQUEST AN OPPORTUNITY TO FILE AN AMENDED COMPLAINT.

"A court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility."  *Taylor v. Wee Health Care Services, Inc.*, 2010 WL 1050130 (D.N.J. 2010), citing See Grayson v. Mayview State Hosp., 293 F.3d 103, 110-111 (3d Cir.2002).  Therefore, if the Court grants Defendants' motion, Plaintiffs request leave to file an amended complaint.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Dated: April 13, 2010                          s/Henry P. Wolfe
(Amended Brief)                                Henry P. Wolfe